Case number 16 at 5063. James Crawford, appellant, v. John F. Kelly, Secretary, Department of Homeland Security. Mr. Fisher for the appellant. Mr. Peterson for the appellant. Good morning, your honors. Good morning. May it please the court. If I could go through what I believe are the errors of the district court opinion which could straighten this case out. I think the trial court judge does two things in her opinion. The first thing she does is she downplays the actual writings, the attachments that Mr. Crawford had submitted with his formal complaint. She says the word that the judge says that he had touched on his claims and we believe that no, he didn't more than touch on the claims. He actually described them pretty well. The second error that I believe... Do you agree that the initial attachment to the complaint, at least as it appears in the record before us, the narrative... Yes. Does not address either the suspension or the performance evaluation? Judge Rogers, I believe that it does not specifically say those things. That is true. However, what it does say... And I'm on page 26 of the joint appendix. With respect to the appraisal in the fourth paragraph down that he goes through in March of 2011 and he references that he needed another person to work with him and that that was turned down. He delves into that, says there were several meetings with Mr. Wheeler. And then he says that continues on the joint appendix, joint 27. He talks about in the fourth paragraph that under the supervision of Helen Williams, he achieved an annual performance rating of excellence with a maximum score of five. And before that, he talks about how Mr. Wheeler, who was the supervisor in paragraph three, had accused him of missing appointments. And this is directly related to his appraisal. He goes through a whole... All right, but let me ask you, when he received the email... Yes. And he only saw eight claims and he said, I'll get back to you, he couldn't respond and indicated he had three more claims. But he never did. Now, I know you were going to say, but the agency had its other obligation to send a second letter. But isn't that a problem for your client? I think, Judge, I think that that is a very fair question. And I think that... Good. Yes. And independently, I know many lawyers would probably get up here and blame the whole thing on the agency. And even with that, I mean, there is still a point, like, what did this guy not do? Didn't he know he had to do something? And I think that the way that the... And I'm on joint appendix 61 here. The way... 61 and 62. The entire way that the email is presented to him is that we've gone through not only what you've said, but what the counselor said. Okay? We've gone through all that. And we understand that these are your claims. And we have some questions about those claims. And the questions are, you know, provide more information. And you have to provide more information. And if you do that, you know, it doesn't say what happens if he does provide more information. It just says if you don't do that, you lose. Okay. So, Mr. Crawford, he answers the questions. I don't think there's any dispute with that. He cooperates. And he's never told, by the way, you know, this is it. There's no, you know, there's nothing more you can do here or anything like that. So, I think the question really boils down to, did this guy... It's not really, did this guy know what he should have done, which he didn't. It's that the standard is, did he cooperate with the process? And he did. And he did. He did. What was... And I think Judge Urbina says, one of the cases that was brought here, that he delves into that, I think in the Ortiz case, or Ortiz-Diaz case. He goes into that. Once the employee does that, once he's timely on that, he's done with his burden. So, I don't think that... I think that he did what he was supposed to do in this plan. I think that the court also, the lower court, relied too much on this Hamilton versus Geithner case. And the judge says that, or I'm sorry, the judge in Hamilton says, and this is the site 666 F3rd, page 1350, that Hamilton's former complaint, formal complaint, makes no mention of his detail. And that's why in the Hamilton case, and it was more than that, the judge in Hamilton versus Geithner, they dismissed the part of his claim that he never exhausted some detail that he got. And the court says that not only on his complaint did he not mention the detail, but that he specifically delved into other parts of his claim. And in Hamilton, he said, I didn't get this promotion, this is terrible, and now he's trying to bring something that's totally unrelated to this, which is a distinguishing factor in this case. In fact... Can I ask you something about... I'm sorry, go ahead and finish your sentence. He says, which is Mr. Wheeler, the supervisor, says in the second paragraph, he says that, well, just introducing what this was, is he had gotten this letter, this suspension, because he had a misappointment with this Ms. Dieterman who was supposed to hold a security briefing. He didn't do it. He gave some answer of why he wasn't there that wasn't acceptable. And then on the third page of this, on J33, he says, Mr. Wheeler says, by not appearing for your scheduled briefing, failing to communicate with your management team, and providing inaccurate statements, because you did all that, you compromised the department's mission. And then in the paragraph right below, he says, and this isn't the first time this happened. This also happened in March of 2011. And I had to counsel you at least twice before this. Okay. And then if you compare that to what he puts on his formal complaint, back to JA26, he goes through this, what happened in March 2011. I guess what I was going to ask you is why you're not pointing to JA28. Oh, I'm sorry. Because that's when Mr. Wheeler talked with me about my midterm appraisal and the false accusation about not being able to contact and follow up with me, which seems like the things you're just referring to. So that midterm appraisal is not the appraisal. But first of all, there's an appraisal attached here, too. That's not the same appraisal. Is this midterm appraisal the one that came before the appraisal that's attached in your complaint? No. He's complaining about his annual appraisal. This is midterm appraisal. Okay. So the midterm appraisal that's referenced here on page JA28 is the same one? I'm sorry. I was looking at six. Sorry. I'm on page JA28, the second paragraph. It sounds like those are two different appraisals. Right. Was the midterm one the one right before this final one that's attached on JA58? Let me see 58. The one that was attached to his complaint. That says annual appraisal. Yeah, that's an annual appraisal. I'm just trying to figure out if, because he attaches, he has this stuff here about the midterm appraisal responding to the things you were mentioning. And he says, they're setting me up to fail. And that's racial discrimination. They're not giving me the support I need. And then after that, if the next one that comes is this final one that has him failing, then that would be the connection, would it not? Yes. It's interesting, Your Honor, because I was using it to show the connection to the suspension, where in March of 2011, he had missed this meeting or something. And that was directly referenced on his proposal to suspend, was that this was one of the two times, or a couple times, and that's what. But they'd be related, right? Yeah. I mean, because it's the same complaints here, and his response is, they're setting me up to fail, and they're not giving me the support they're giving white males. And so when then he then attaches a suspension that talks about those same problems that he just said here were alleged were racially discriminatory, and he attaches appraisal. Yes. It seems to finish the story of the setting me up to fail. Is that? Yeah. Yeah, that's correct, Your Honor. I know the district court decided on timeliness grounds, like, you know, time bar. Is there any, I mean, is this, if one were to look at this on the merits, has this created a claim of discrimination? Oh, I don't believe there's ever been anything on the merits in this case. I'm just asking you. Oh, okay. This client, I only started representing him at this stage, so. Presumably you think there's a claim here, otherwise you wouldn't have to. Oh, yes. Oh, sure. Can you just give us a, you know, a view of what the discrimination theory is? Oh, what his claim is? Okay. Well, he has his complaint. Also, I'll just note that he retained me after he filed all this. It doesn't matter. We assume you've familiarized yourself with the record. Yes, but I've looked through the case and everything like that. We're not blaming you. No, I understand, Judge. I'm just, if my knowledge is maybe a drop limited as to some of the details of his underlying claim. But basically he's got three claims that he wants to pursue. And one of them is that his appraisal score was zero, okay, instead of a five. Now, a zero appraisal score is extremely detrimental to somebody's career. There's no question that it would have, I mean, there's always a question in a particular case, and that would be an underlying merit issue of how it affected his career. But generally, an appraisal score of absolute zero generally will lead to some sort of track of termination. Then he claims in his other claim that there was an unadvertised position. I mean, this happens in the government far too often. And it went to someone that it would have been a promotion, and he didn't have a chance to apply for that, so it would be a failure to promote, and presumably these people were white. And then he got a suspension, and his suspension is by his white supervisor, who he says was out to get him. The way I would litigate. I'm sorry, is that promotion that he's challenging there the same one or a different one than the one he mentions on JA-26? Okay, just give me a second. I'm just a little confused. Which paragraph? So next second to the bottom. My supervisor, Ms. Helen Williams, submitted me for promotion in November 2011, and then he talks about how Craig Rustick held up the packet. That is. That's the same? Yeah, and he lists on his, he handwrites on his complaint on JA-6. He handwrites 11-1, 2011. So if you go back to 26, if you go back to 26, what I think he's referring to there is that his supervisor likes him. This new supervisor likes him, and what she does generally is she wants to help him out. She submits a promotion packet, or she wants to, or something like that. He says that she submitted it, but that right stack held the packet up. Now, the exact detail of the other guy getting the job with his promotion being held up, that I'm not clear on. But I would say that based on what he said, that it does seem related at least, it's in the same month. So I would think that there's some connection there that would justify a favorable inference at this stage of the case, that that was what he had complained about. I think my question was less about what the adverse actions are that he's identified and more about what's the theory that he was being discriminated against based on race. Oh, well, what we would do to litigate this case, and this is what courts generally allow at district court level early in a case, is to seek discovery on comparators, on the way that Mr. Wheeler treated others. And the fact that he hasn't alleged his race or the race of other actors is just because he's pro se. I would. Because really one of the things you would do is file an amended complaint. Oh, sure. Yeah. But you didn't do that when you came in. Well, I didn't do that because there was a motion to dismiss. Well, that came in a month later. Oh, I'm sorry. The motion to dismiss came in a month later. Right. Well, I think he retained me after that. I could be wrong, but that's what I seem to recall about it, that he had come to my office with this. Anyway. Did you tell the district court in opposition to this motion to dismiss slash motion for summary judgment that you were planning to file a new complaint? No. Oh, I didn't. Why don't we hear from Ashley? Okay. Thank you, Your Honor. May it please the Court. Benton Peterson for the government. Title VII requires that when an agency is alleged to have discriminated against its employees that the agency itself is allowed an opportunity to investigate and perhaps resolve that discriminatory allegation. Mr. Crawford here had failed to put forth certain discrete and insular allegations before the agency that would allow the agency to identify those as particular claims. And he did that in the form he alleged that he provided those claims to the agency in the form of attachments to his formal EEO complaint. The attachments themselves reference two events, one being a suspension that Mr. Crawford alleges that those two documents support three different claims that he's trying to introduce now, the third claim being that there was a promotion that he believes was. Well, he says his complaint, which means, and I get those allegations, the eight allegations were dismissed on timeliness grounds, but that means you don't pursue them. It doesn't mean they're still not part of his fact story. So his fact story in his complaint is all those allegations plus the attached suspension papers and appraisal. You'd agree with that, right? When he's before the administrative level or at the district court level? This was his EEO complaint, his formal EEO complaint. Yes, yes. And so all of the, of course, the eight claims that were ultimately dismissed at the district court level were before the administrative level, and the former complaint manager did list those eight issues in the e-mail that's already been alluded to here. In that e-mail, and I think what's of particular concern, perhaps, to the court is the notice that was provided to the complainant about what would be investigated. Just going back to what the complainant submitted, what's your understanding of what a reasonable person reading the complaint to the agency would have thought those attachments were? What role did they play, if not the role that Mr. Crawford asserts, which is, I have an ongoing problem. They were setting up to fail, and this happened in these various steps, and look, these are the latest. And so what role were those attachments playing that isn't something that extends the conduct into the time period? Right. That is the question, and there are other alternative ways to view those documents. But taking a step back, it's the complaint manager that delved into the three-page long single-space narrative and excavated the eight claims that were presented in that format. And what's your theory of what that claims manager did that you would defend as reasonable agency action vis-à-vis the attachments? Yes. The agency and the complaint managers themselves are taught to avoid what is called fragmentation. Now, this is a concept that's in the Management Directive 110, Chapter 5, and that's provided to EEO managers when they're trying to delve into dense narratives like this one we have before us. Now, the issue of fragmentation occurs when there's a confusion between a claim and evidence to support that claim, hence why the narrative is all important for not only this formal complaint manager but for all the formal complaint managers to try to be careful in ascertaining what is the allegation versus what does the complainant provide as support for the allegation. So in this case, having gone through the narrative and under a reasonable reading of the narrative, having not detected any connection between what the eight claims were and the document in a direct sense, the fragmentation issue that they're trained to identify was probably at the forefront of his mind. This seems like the inverse. This seems like precisely a fragmentation problem in that, and this is true even in the government's briefing, describing the narrative and the aspects of the narrative, the things that happened to Mr. Crawford, as discrete claims. They're not discrete claims. And in fact, the EEOC itself on JA-7 says, believing he was subject to a hostile work environment. It's an umbrella theory, whether it's harassment, which is also one of the characterizations that both he, Mr. Crawford, uses and the government's hostile work environment. It's a bunch of facts under a legal umbrella. And in fact, it seems like there's hyperfragmentation in what the claims reviewer was doing and saying, well, this is a claim and that's not relevant to this claim. I mean, if you're exercising common sense and not being hypertechnical with a pro se employee, wouldn't you look at all of this and say, oh, same supervisor, set up to fail, couple months later, looks like failure? Of course, the efforts at defragmentation is not a science. And in this case, there can be argument to say that, indeed, maybe some claims that were listed here could have been combined into one umbrella claim and provided other, just in terms of the investigative standards here. But that was the effort. And in answering the court's question as to the theory behind what could these two pages or two documents, how could they be analyzed and processed other than this is part of the claim, I believe that is the reason. And that is why the claims manager, rightly or wrongly, but more importantly, reasonably, thought that the eight claims that they did discover and that he did present to the complainant were the eight claims to go forward with. Well, just hang on. If you're a lawyer, if a client walks into your office and says, I've been working in this place for a long time under Ms. Helen, I was getting fives, which is the highest score in my appraisals. New guy shows up. He's white. I'm not. I'm African American. And I get a midterm appraisal. And it's got this negative stuff about me not being available, these types of things. It's not true. It's false. They're setting me up to fail. They're not giving me the support that they're giving to white workers. And here's my final appraisal zero. Would you think that final appraisal zero had nothing to do with that story about five to midterm discrimination, lack of support, setting me up to fail? Fail? Wouldn't you think that fail is the bookend of the story? So certainly there is a connection there. We're dealing with the same evaluation year, and we're dealing with the same review of a performance. The difference is that in the midyear, there were several distinct complaints about what actually happened in the midyear. And you're absolutely correct that the complaints that the complainant identified about the midyear were that there were false accusations about or inaccurate accusations about him missing meetings or not being reliable as an employee. And setting me up to fail, and then he submits the documentation of failing. So that clearly was not a separate claim, the performance appraisal. That's clearly part of his whole story, correct? If... If a client walked in your office, you'd have to lay it out for you. He said, they set me up to fail, fail. I understand the theory. Part of the reason why the narrative becomes crucial is to help the claims manager understand that theory. Okay. So what is the status of the management directive? You mentioned it earlier. The status of it. Yes. Because in order to protect the claims manager, as well as the complaining party, particularly as a lot of these people will be pro se, it calls for sending what is described in the brief as a second letter. Yes. That basically says, here's what we're going to investigate. Have we covered everything? Or is there something we've missed? That letter was never sent. Is that correct? In terms of a second letter, that is correct. No, I'm talking about the letter. The shorthand is second letter. Yes. It's what the management directive tells the claims manager and everybody else to do to avoid this very problem. There are a couple complications with this case that may have interfered with that process. Now, first, I believe that the agency believes that that email that we've been referring to contains the key components of an acceptance letter. But not all. Not every component. Not the key. I'm sorry. Not the key. Yes. And so let's get to that. Right. So the key being notice. The key being some sort of fair notice of the complainant, that this is what we're going to investigate. And the exclusory terms of this is all we're going to investigate, this is the only thing, if you need to provide more, it's not found in an email. No. And that is true in the face of it. However, what the agency presents is that the email itself, in the second paragraph on the email, in bold, talks about how the actor talking to everyone that's been involved with this case so far, after reading everything in this case so far, these are the claims we've identified. And while it's not exhaustive, I mean, in terms of being exhaustive, that was the agency's attempt to make an exhaustive attempt to tell you all the claims, not just the claims we have questions about, which I agree would be misleading. If the email only said we have questions about these claims, answer these questions and we'll move forward. Following discriminatory incidents, not these claims, following discriminatory incidents, all of which he had narrated, what's to put him on notice that there's even a question here about timeliness? You know, they're basically saying, okay, this is everything, you know, as long as we confirm the timing, you're out on your ear. If they had said, you know, what's your connection between, you know, the most recent conduct and these things, I mean, there's nothing like that. In terms of putting the complainant on notice. He was on alert that there were problems with timeliness with his claims. This email did not serve that purpose at all. Is this the only document? There's a reference in your brief to the counseling report. Is that what this is? I'm on page 9, line 3. It's your background information. He raised three claims at issue, background information as the counseling report reflects. Does this refer to his attachments as background information? I'm just wondering, is there something that we're missing? I don't believe we're missing any documents, Your Honor, but I do know that this is not considered the counseling report. Where is that document? The EEO Counselor's Report. This says, even if Carver explicitly raised the three claims at issue and the attachments as he contends, rather than, and this is what I thought your competing characterization was, rather than as background information as the counseling report reflects. Where is that from? There's no citation. Right. We just don't know. I don't believe that it's in the joint appendix at this time, and I believe that what it was referenced to was referencing another reference to the joint, the counselor's report, but not actually placed in the joint appendix. If there is another document, would you provide that? Yes, Your Honor, of course. Of course we will. But the point with that argument was that the information that was added to the narrative in the formal EEO complaint could reasonably have been thought of as background information or, at the very least, an evidence of the culmination that they're out to give me. It's not evidence. It's the next step. It was a distinct pursuit. Every government employee knows when a new appraisal is its own action. This is true. However, it depends upon what happens between that midterm evaluation and the actual performance evaluation. There are several things in this case that happen. What happens is exactly what he predicted. There are several things that happen between the midterm and the final, and it's not clear that Mr. Crawford would contest every negative thing that's been alleged in his final performance evaluation. He didn't make qualms about the things that were mentioned at his midterm. So there could be a difference between what happened at his midterm and his final. I'm sorry. You mentioned in this e-mail that went out that it referenced that the counselor had talked to everybody involved. Did that include talking? I just don't know how these processes usually work. Does that mean talking to Mr. Crawford, including the agency people involved? Did the counselor actually talk to Mr. Crawford? No, Your Honor. Is that part of the process? No. If I implied that that was my mistake, I don't believe. There's no record of him actually having a discussion with Mr. Crawford. What I was referring to was the communication between he and the EEO counselor in terms of just how he read the report at the very least, considered the report, and considered the formal EEO complaint and the narrative in coming up with the list of issues that he identified for further investigation. And just so I'm clear, the EEO counselor's report, that would be presumably regarding Mr. Crawford's first complaints or interviews with the EEO officer? In interviews, yes, Your Honor. In October 2011, Mr. Crawford, four days after his final performance evaluation, approached an EEO counselor and provided informal counseling at that stage. Those informal counseling remarks, of course, don't make up what a formal EEO complaint would be and don't always square with what's actually going to be investigated. So that was the point being that, you know, there are things he talks about there that don't show up at the final stages of his formal complaint. And so ultimately, the question is, with regard to the DHS's action, with regard to the two documents that relate to two instances, not three, and I need to make sure I'm stating this clearly, the issue dealing with a promotion in 2011, there's no document attached to any complaint that supports that, that would have given the agency notice that this was an issue. The first time that we are aware of this in a very formal way is at the federal level, where the federal complaint, when in his federal complaint, Joint Appendix 6, I believe, he indicates that there was a promotion in which someone less qualified than him was provided the position and started the position in November of 2011. Now, what's noteworthy about the complaint as well is that in that final two paragraphs of his complaint, before the relief section, he talks about making contact with the EEO office concerning these three, these very same three issues he's bringing up now. The suspension, the final appraisal, and the promotion. This is contemporaneous with the formal complaint coming to him for his review through the e-mail in February. So as late as December of 2011, he was indicating, still communicating with the EEO office, because he's presumably the EEO counselor, although we have no record of that, we have no proof of that, but according to his own complaint, these issues were fresh in his mind, things that he knew he wanted to add. And when presented with a list in an e-mail that says, after sussing out everything that we can from the counselor's report and from your formal complaint, these are the eight issues we have, the complainant stays silent as to an e-mail, a phone call, some indication to the manager, wait a minute, I have these three things I've been telling you about. Can you include that as well? But if he thought that was already there through the attachments, why would he think he had to say more? Because the argument that the agency wants to present is that a reasonable complainant, when you're faced with the allegation, or at least the argument from the manager that deals with these complaints, that he's read everything, he's read all your submissions, and these are the eight things that he can come up with that are going to be the topics of investigation, that a reasonable complainant, someone interested in pursuing their rights, would say, well, at the very least, you're not complete in your listing of the issues that need to be investigated. Here are three more. It seems like we have a problem here, and that is, as you've admitted, the agency didn't say the kinds of things it should have said to put him on notice in its e-mail, that this was meant to be an exhaustive list and that he should get back to them if he doesn't agree with that list. So they didn't do their part. But you agreed with that, that on the face of it, it doesn't qualify as an acceptance letter or whatever that second communication is under the directive. It doesn't meet those requirements. On the other hand, as you're now saying, he didn't do what a reasonable person should do. So my question is, when you're talking about an EEO process, which is supposed to be a dialogue, a mediation, for lack of a better word, a conciliatory process for the agency to try to handle itself, and you have both the agency not giving the notice that we want for a pro se process and an individual not responding the way people think might be reasonable, who should pay the price for that? When both sides messed up, who should pay the price? So at this point, at this stage, what we're talking about here is looking at the continuum of reasonableness. So the email, does it equate to an acceptance letter? Probably not under what the rules are in terms of how. Not really probably, it just doesn't. Yes. But at the same time, the question is, are there components of the email that would put a reasonable complainant on notice? Were there opportunities for. . . A notice that this is an exhaustive list unless you tell us otherwise. With legal consequences. On notice, at the very least, this is an exhaustive list. With legal consequences. That's the point of the notice is that it's legal consequences to it, right? Yes. But with the idea that if there are questions or concerns about what has been listed, there's a contact information there of the manager themselves who have contact with the complainant. And so you add that to the reality that at that stage, we're not even close to a decision or the final investigation of these complaints yet. At any time. I'm sorry. Just so I'm clear in response to Judge Millett, as part of your answer that at least at JA-61, we have a response from Mr. Crawford saying he's working on additional information to add and clarify his complaint. Yes. And then apparently doesn't do anything. So to that extent, I mean, that's a very short sentence, and who knows what it really means. Right. He understood he had an opportunity. He understood he had an opportunity. He understood that those three issues were things that were not discussed with the EEO counselor in October of 2011. He understood that he wanted to add those claims according to his federal complaint. He had done that contemporaneously with this e-mail. I mean, at least with the formal complaint that he filed. And the e-mail that happened that was sent in June listed the eight issues that it found to be liable, or at least areas of examination for the investigation. But back to Judge Millett's question as to who pays the price. Yes. The management directive protects the agency, it seems to me. It says if you don't want to get into any problems, send out this second notice. It gives clear notice to whoever is filing the complaint, particularly where it's a pro se person claiming unlawful discrimination. So why shouldn't that be dispositive, as it were, The agency has experience in handling these matters, knows that it's often difficult to understand the full nature of a pro se litigant's written document, and they don't have a personal interview to go on. So we'll just send this letter out. And that makes it clear not only to the pro se, but it would protect the agency against any claim that it didn't properly look at the formal complaint. Right. So the only way that I believe that it is necessary to get to that point, to say that management is to blame, is to discount some of the language in the e-mail, the protective language that made an attempt to give the complainant notice. But all I'm getting at is management has already assessed the situation. Yes. In this case, and come up with a solution. It's a solution that, of course, when these directives appear and regulations appear, there isn't a form letter, there isn't a No form letter attached? There isn't, as far as I can tell. So that these managers, these formal complaint managers, when they're trying to author these letters, they're doing it based on their own practice a lot of times. Sure, but I thought you had indicated that the management directive is a guide to the claims examiners and others. It is a guide. It is a guide. And it stands for certain principles, and the principle of explicitly indicating the consequences of not responding were in this e-mail, but it was with regard to clarifying those points. The time. Yeah, the time. And not to saying, this is the totality of your arguments. However, like I said, the complication here is that the response was that, okay, as a complainant, I'm going to get back to you with more information, which may have stalled out the process of providing the next communication. And when that didn't occur, the investigation went on, and it was determined that the eight claims that were identified were untimely. And the two and the three that are now being submitted, only two have documentation that even can arguably be supportive of it. There is no documentation with regard to the promotion in 2011. The suspension itself, which is not in the narrative, is another document that could have been determined to be part of the fragmentation issue of whether this is evidence of or this is a separate claim being asserted by, which could be cleared up once again by a line or two, a sentence or two, in a three-page narrative that this is what I want to do. I want to have a claim or I want this investigated by the agency. And it would have been, I mean, given the history of this case, it would have been added to the eight claims that were provided. Can I say that again? At no point in this process does the EEO official pick up the phone and talk to the parties involved? No, they don't talk. They do? Or they don't? I'm talking about the EEO process. Well, I guess what I'm saying is that it's a question, of course, I thought of in the previous case. I mean, it seems like a common-sense solution. I think it's one of, first, there is no record of a communication between Mr. Toledo. Yeah, I'm just asking how the process works generally. There's no, I'm not aware of any prohibition against contacting directly the plaintiff. In fact, in this case, he invited the contact. He said, call me if there's a question or if there's a problem. Here's my number. So I think in this case it didn't happen, like I said, for the reasons that receiving the kind of response that he did back from the complainant indicating that there was more to come. Perhaps it put it into another star category. I mean, this is all things that were not before the district court in deciding all these matters. I didn't know how the process works. But these are the realities. And I think the court is correct that every case would be different. Every case manager has some idiosyncratic method. Well, that's why we have this management directive. I'm serious. At any rate, thank you. Can I ask one question? Sure. I'm very sorry. But on the performance appraisal that he attached, he says his final rating was zero. Yes. So he gets 1.92 for performance goals and .657, whatever, for competencies. And they say total, zero. How is it that you add up 1.92 and .65 and get to zero? Actually, if you add those numbers up, he gets a little over 2.5, which gets him into achieved expectations. Is there something about it? Maybe you don't know. Of course there is not. This is in discussions with the agency. I can tell the court that that particular performance evaluation has been rescinded and taken out of his performance file because of errors. I don't know if that was one of the errors that was made. It should be. It's a pretty much math error. Perhaps it was. But the bottom line is I am not familiar, and I'm not averse, with how calculations happen. But ultimately, this performance appraisal has been withdrawn. I can tell you it's not part of this appraisal. Thank you. All right. Counsel, give you a couple of minutes. Just very briefly, just a couple of things. One, just the thing with the appraisal. I think part of this claim would be whatever damage that caused him until it was taken out of his appraisal. Right. So that's one. And just very, very briefly. Not needless to say, but this court's precedent is not very favorable to just claims based on performance evaluations. I understand. All right. So what are your other points? Just the last point. I think the court has really understood this case, that notice in law is a big deal throughout the thing. I think this case just has a lot of precedential value going forward. Harmless error? Since he responded and said, I'm working on this, and I'll get back to you. Well, that I'm not quite sure. I'm just asking. Yeah, that I'm not quite sure what happened after that. But I think that at the end of the day, I just think it's a notice issue. But there is harmless error associated with notice requirements. In that what? Well, he had an email. And it said, if you have any questions, call me. And he responds saying, I'm working on my complaint. But he still doesn't have, look. The magic words. Yeah, what's the consequence? Someone gets a summons. Notice, I'm getting sued. And it says, I have a summons. If you don't respond in 20 days, you're in trouble. All right, well, what else? That's what this case ultimately is. Thank you. We will take the case under advisement.
judges: Rogers, Millett, Pillard